In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-1613

UNITED STATES OF AMERICA,

*Plaintiffs-Appellees*,

*v.*

SCOTT SERFLING,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 300—**Matthew F. Kennelly**, *Judge.*

ARGUED JUNE 7, 2007—DECIDED OCTOBER 5, 2007

Before BAUER, ROVNER, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Scott Serfling and codefendant Mary Capri engaged in a scheme to defraud Western United Life Assurance Company ("WULA") of nearly $12 million by procuring a loan through repeated false representations. Capri pleaded guilty, and a jury found Serfling guilty of two counts of wire fraud, 18 U.S.C. § 1343, and one count of mail fraud, *id.* § 1341. The district court entered judgment against Serfling and sentenced him to 78 months' imprisonment, three years' supervised release, and restitution in the amount of $6.75 million. On appeal, Serfling argues that his convictions must be vacated because the government withheld exculpatory evidence and engaged in prejudicial miscon-

duct by making improper remarks during the trial. He contends as well that the district court erroneously excluded relevant testimony by a banking expert. Serfling also challenges his sentence, from the calculation of the guidelines range to the length of his prison term as compared to Capri's. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

**I.**

Serfling worked as a car salesman at Celozzi Ford Dealership in Waukegan, Illinois. In 2000, the dealership's owner, Nicholas Celozzi, and Ford agreed to expand the operation and open a second dealership in Gurnee. Under the terms of their agreement, Ford would sublease the property from Celozzi for 25 years for $76,600 per month. The sublease agreement was to go into effect after construction of the dealership was complete and Celozzi obtained a certificate of occupancy from the county. Celozzi selected Serfling as a partner and financial advisor for the new project.

Construction of the new dealership commenced but stalled in early 2001 when various contractors and subcontractors stopped work because they had not been paid on schedule. In light of cost overruns, Serfling renegotiated the sublease agreement with Ford, which agreed to a rent increase. Months later, Serfling procured another rent increase, so that Ford would pay $99,800 per month to sublet the property upon completion of construction and the issuance of a certificate of occupancy. In November 2001, however, Ford reconsidered, and it terminated the lease agreement entirely.

Shortly after Ford canceled the contract, Serfling and Capri embarked on a plan to purchase the Gurnee property themselves. At that time the property was controlled by Fifth Third Bank, which had supplied a construction

loan. First, Serfling and Capri had the property appraised by Robert Schmidt. Serfling told Schmidt that the property would be subject to a dealership lease, and in support of this representation he faxed Schmidt a "proposed" lease agreement between Ford Leasing Development Company and Celozzi/Serfling Ford, Inc., whereby Ford would lease the Gurnee property for $125,000 per month. In actuality no such agreement existed, but based on Serfling's representation, Schmidt valued the property at $15.7 million.

Serfling and Capri next shopped for a lender to finance their purchase of the Gurnee property. Acting as a broker, Capri enlisted a commercial loan broker, Francisco Gonzalez, to find a lender for a borrower she identified as Scott Serfling and his company, Serfin Trust LLC. In response to Gonzalez's request for documentation, Capri sent a package containing 1999 and 2000 tax returns for Serfling and Serfin Trust, signed by Serfling. In fact, Serfling had not filed tax returns as an individual or on behalf of Serfin Trust in 1999 or 2000. The package also included the "proposed" Ford lease agreement. That document was signed by Serfling and a "Susan Morgan" on behalf of Ford. Trial testimony revealed that no "Susan Morgan" worked for Ford.

Armed with the documentation he received from Capri, Gonzalez began shopping for a loan for Serfling. He found one at Old Standard Life Insurance, an affiliate of WULA. Loan officer John Byers testified that he believed that the loan would be a sound investment based on the financial strength of Serfling (evinced by his tax returns, and, later, bank statements) and the long-term lease with Ford. Eventually Byers, on behalf of Old Standard and WULA, agreed to loan Serfling and Serfin Trust $11,750,000.

As a condition of closing on the loan, WULA requested bank statements from Serfling, who resisted this request

in a telephone conversation with a WULA representative. Ultimately, however, Serfling relented, and Capri faxed statements from Firstar Bank to Gonzalez, who relayed them to WULA employee Shelli Findley. According to the statements, Serfling had more than $10,000,000 in a personal account, and Serfin Trust had a balance of nearly $1,000,000. Trial testimony later revealed that neither Serfling or his company ever held accounts at Firstar Bank.

As WULA continued to investigate the potential borrowers, it attempted to contact "Susan Morgan" to verify the terms of the Ford lease. An underwriter for WULA spoke on the telephone with a woman identifying herself as Susan Morgan. At trial, Serfling stipulated that the telephone number provided on the phony lease agreement for "Susan Morgan" was registered to Capri. WULA also continued to request, as a condition of closing the loan, a copy of a certificate of occupancy for the Gurnee property. WULA insisted that $100,000—a sum more than adequate to cover remaining construction costs—be placed in escrow for release after the certificate was issued. For his part, Serfling demanded that $200,000 of the loan proceeds be dispersed to him directly in order to pay other expenses relating to the property.

Serfling also provided WULA with the name of a construction company, which, he said, would finish building the dealership. WULA attempted to contact the company numerous times but could not reach anyone at the phone number Serfling supplied. Unsurprisingly, Serfling stipulated at trial that the company did not exist. Capri and Serfling also fabricated an insurance company to satisfy WULA that the Gurnee property was appropriately covered.

In March 2002, WULA was prepared to close on the loan, and it wired the loan proceeds to the title company in

Chicago that was handling the closing. Serfling was not present for the closing, but he sent signed and notarized copies of the necessary closing documents to the title company from Las Vegas, where he then lived. Serfling also sent instructions, including a directive that $620,000—an amount including the funds earmarked for the insurance premium, brokers' fees, and construction costs—be paid to him directly in addition to the $200,000 that had already been agreed to. WULA rejected this demand, and Serfling sent new instructions that the insurance premium could be paid to the (phony) insurer, the brokers paid directly, and the construction funds placed in escrow. Finally, the loan closed.

Upon receiving his $200,000 in loan proceeds via wire transfer, Serfling promptly spent it. He repaid part of a loan from a friend and settled other personal debts, and he paid his bill with the business-services provider he and Capri had used during the loan negotiations. He also paid a debt to the Rampart Casino in Las Vegas and opened a line of credit at the Sun Coast Hotel and Casino. Serfling did not use any of the proceeds for costs associated with the Gurnee property. Meanwhile, in his capacity as the "new owner," Serfling enlisted a former colleague to be the "caretaker" of the property.

Predictably, when the first loan payments came due, Serfling did not pay. An investigation was launched and a grand jury ultimately indicted him for wire fraud and mail fraud. Serfling pleaded not guilty, and the case was set for trial. Before trial, he moved *in limine* to bar the government from referring to gambling or casinos as part of its case. After a hearing, the district court ruled that the government could submit, as evidence of Serfling's motive to defraud WULA, evidence of debts existing at the time of the fraud. However, the court ruled, the government could not mention that the debts related to gambling. As for other amounts Serfling spent at casinos with the

proceeds of the loans, the district court determined that those sums were irrelevant to motive and would be unfairly prejudicial.

In another evidentiary decision, the district court barred testimony by Serfling's banking expert. Serfling wanted the expert to testify that with due diligence, WULA would have discovered the fraudulent documentation used to procure the loan. He also hoped that the banking expert would reinforce his theory of defense, which was that the fraud had been executed by Capri and Fifth Third Bank wholly unbeknownst to Serfling. Serfling's banking expert would testify that if WULA had engaged in a reasonable investigation, Serfling would have been alerted to the attempted fraud in his name before the loan closed. The district court was doubtful that the subject matter was suitable for expert testimony but determined in any event that Serfling essentially aimed to blame the victim of the fraud, and so the testimony was not appropriate under *United States v. Coffman*, 94 F.3d 330, 333-34 (7th Cir. 1996).

Trial commenced on September 19, 2005, and lasted two weeks. The jury returned a verdict of guilty on each of the three counts, and the parties prepared for sentencing. The probation office prepared a presentence report ("PSR") recommending, in relevant part, that Serfling's offense level be based on a loss amount exceeding $2.5 million, *see* U.S.S.G. § 2B1.1(b)(1)(J), and gross receipts in excess of $1 million, *see id.* § 2B1.1(b)(13)(A). Serfling argued that both figures were calculated improperly, but the district court adopted the recommendations in the PSR over his objections. Based on a guidelines imprisonment range of 70-87 months, the district court imposed a 78-month sentence. Mary Capri, who pleaded guilty to one count of the indictment, had been sentenced to a prison term of 27 months.

**II.**

We begin by addressing the challenges to Serfling's convictions. He first argues that his trial was rendered unfair by the prosecutor's reference to his involvement with casinos and gambling, in violation of the district court's pretrial ruling on the subject. The challenged remark occurred while the prosecutor was questioning Rampart Casino employee Debra Colson about a $4,800 debt that Serfling paid off with the proceeds of the loan. Despite the district court's earlier ruling that the nature of Serfling's debt could not be discussed, the prosecutor referred to "Rampart's Casino" and elicited testimony about the practice of issuing "markers" that, in the prosecutor's words "can then be used to spend in the casino." Serfling objected to the line of questioning, and the district court sustained the objection. The government explained that it had misinterpreted the court's ruling on the motion *in limine* to mean that, although Serfling's other expenditures at casinos were off-limits, the preexisting debt to Rampart's was relevant to motive. The district court reiterated that evidence of the debt's existence was admissible, but the nature of the debt was not. After chastising the prosecutor for the error in a sidebar, the court struck the offending question and testimony from the record and instructed the jury to disregard it.

In reviewing a charge of prosecutorial misconduct, we first ask whether the challenged remark by the prosecutor was improper, and second, whether it prejudiced the defendant. *See United States v. Simpson*, 479 F.3d 492, 503 (7th Cir. 2007). Because of the district court's pretrial ruling, the prosecutor's reference to gambling was improper. To determine whether Serfling was prejudiced, we look to a number of factors, including: (1) whether the prosecutor misstated the evidence; (2) whether the remark implicated a specific right; (3) whether the defendant invited the response; (4) the efficacy of curative

instructions; (5) the defendant's opportunity to rebut; and (6) the weight of the evidence. *See United States v. Hale*, 448 F.3d 971, 986 (7th Cir. 2006); *United States v. Love*, 336 F.3d 643, 648 (7th Cir. 2003). Ultimately, the inquiry turns on whether the improper statement "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden vs. Wainwright*, 477 U.S. 168, 181 (1986) (quotation marks and citation omitted).

Under the totality of the relevant factors, we conclude that the improper statement did not result in an unfair trial. Prompted by Serfling's timely objection, the district court immediately halted the prosecutor's improper line of questioning and issued a curative instruction to the jury, the substance of which the court repeated during its final jury instructions. At that time the court reminded the jurors that any testimony or exhibits that it told the jury to disregard were "not evidence and must not be considered." As always, we presume that the jury followed the court's instructions, absent evidence of an "overwhelming probability" that it was unable to do so. *See United States v. James*, 487 F.3d 518, 524 (7th Cir. 2007). Serfling has not met his burden of establishing such a probability. *See United States v. Eberhart*, 434 F.3d 935, 939 (7th Cir 2006). Moreover, the evidence of Serfling's guilt was substantial, and it is the weight of the evidence that we have identified as the factor "most important" to the prejudice inquiry. *Love*, 336 F.3d at 648. Particularly damaging was the evidence that Serfling and Capri prepared and disseminated phony documents such as the lease agreement, tax returns, and bank statements in order to secure the loan. Additionally, Serfling stipulated to the invention of individuals and entities that thwarted WULA's investigation of the loan application. Given the curative action taken by the district court and the amount of evidence of Serfling's guilt, we conclude

that the reference to gambling did not so infect the trial as to deprive Serfling of due process.

Serfling also contends that the prosecution withheld exculpatory evidence from him in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The evidence consists of a memorandum written by Bruce Crutcher on behalf of Fifth Third Bank describing the bank's efforts to find a buyer for the Gurnee property. The memorandum discusses numerous problems with the property and memorializes the offers the bank had obtained. Crutcher goes on to advise that, although selling to the property to the highest bidder would still leave the bank with a "hideous loss," the property should be sold as soon as possible because its value would only depreciate over time. This memorandum came to light only during sentencing, when the government submitted it to aid in valuing the property for purposes of calculating the amount of loss.

Before trial Serfling had requested that the government produce any evidence relevant to Fifth Third Bank's desire to quickly unload the Gurnee property, which it had obtained by foreclosing on a construction loan. Serfling hoped to prove that Fifth Third Bank, motivated by a desire to shed the property from its portfolio, had perpetrated the fraud in cooperation with Mary Capri. About a month before the trial started, the government notified Serfling that it had received about 10,000 pages of documents produced during a civil litigation involving Fifth Third Bank. The government informed Serfling that it had not photocopied the documents "because they do not appear to be relevant to the trial," but stated that they were available for inspection at any time. The government reminded Serfling about the documents in another letter about ten days before trial. Crutcher's memorandum was among the documents, but Serfling never inspected them.

Serfling argues that the memorandum was exculpatory evidence proving that Fifth Third Bank had a motive to defraud WULA, and the government was obligated to produce it before trial. Under *Brady*, the government violates its duty to produce exculpatory evidence when (1) the evidence at issue favors the defendant because is either exculpatory or impeaching; (2) the government suppresses the evidence willfully or inadvertently; and (3) the suppression of the evidence results in prejudice. *United States v. Childs*, 447 F.3d 541, 545 (7th Cir. 2006); *United States v. Fallon*, 348 F.3d 248, 251-52 (7th Cir. 2003).

Even if we agreed that the memorandum tends to support Serfling's case,[1] the government did not suppress it. The government "suppresses" evidence for purposes of *Brady* if it fails to disclose the evidence in time for the defendant to use it in his defense, and the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. *See Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007). In this case, the government made the memorandum available for inspection—a fact inconsistent with suppression. *See United States v. Knight*, 342 F.3d 697, 707 (7th Cir. 2003) (concluding that no suppression occurred where supposed *Brady* material was "part of the evidence that the government had invited the defendants to inspect and copy before trial"). Serfling did not take even a cursory look at the documents, although his defense was based on the culpability of Fifth Third Bank and others. The uncritical reliance on the government's characterization of the

---

[1] This proposition is dubious at best. Exculpatory evidence supports a claim of innocence to the crime charged. Even if the memorandum inculpated Fifth Third Bank in a fraud scheme, it does nothing to suggest that Serfling is any less culpable for the fraudulent acts he committed.

documents as "not relevant" hardly qualifies as reasonable diligence. *See United States v. Wright*, 218 F.3d 812, 813 (7th Cir. 2000) (Where government told defense counsel about evidence before trial, "that defense counsel did not follow up by obtaining more details can't be treated as a constitutional violation by the prosecutor"); *United States v. Senn*, 129 F.3d 886, 893 (7th Cir. 1997). Serfling also hints that the government did not disclose the materials in a timely manner, but this argument fails because he never asked for a continuance to review the documents; indeed he did not indicate in any way that he ever intended to inspect them. *See United States v. Warren*, 454 F.3d 752, 760-61 (7th Cir. 2006).

In his final challenge to his convictions, Serfling argues that he was prejudiced by the district court's refusal to let his banking expert testify that reasonable investigation by WULA would have prevented the loan from closing. As the district court determined, Serfling's argument is foreclosed by our decision in *United States v. Coffman*, 94 F.3d 330, 333-34 (7th Cir. 1996), in which we held that the perpetrator of a fraud may not defend himself by blaming the victim for being duped. *See also United States v. Thomas*, 377 F.3d 232, 243 (2d. Cir. 2004) (collecting cases). Serfling suggests that the expert's testimony was meant to serve the additional purpose of establishing that reasonable action by WULA would have alerted *him* to a fraud of which he was otherwise completely ignorant. But the expert's testimony would do little to support Serfling's theory that he was wholly unaware of the fraud. Serfling's intent is not an appropriate subject for expert testimony, and Serfling does not claim that the expert had personal knowledge regarding what Serfling knew, nor when. Therefore, the district court did not abuse its discretion by excluding the expert witness.

Having concluded that Serfling received a fair trial, we turn to the arguments about sentencing. First Serfling

argues that the amount of the loss and the gross receipts he obtained were improperly calculated, resulting in 18-level and 2-level upward adjustments to his base offense level, respectively. Both calculations are findings of fact that we review for clear error. *See United States v. Al-Shahin*, 474 F.3d 941, 950 (7th Cir. 2007); *United States v. Frith*, 461 F.3d 914, 917 (7th Cir. 2006).

Serfling maintains that the loss amount of $6.75 million calculated in the PSR and accepted by the district court was improperly based on the gross rather than the net loan proceeds, and that it fails to account for the "below fair market value sale of the Gurnee property." We are not persuaded by either argument. To estimate the amount of loss, the district court properly subtracted the price WULA ultimately obtained for the collateral ($5 million) from the amount of loan proceeds ($11.75 million). *See* U.S.S.G. § 2B1.1(b)(1)(J) & cmt. n.2(E)(ii)[2]; *United States v. Lane*, 323 F.3d 568, 585 (7th Cir. 2003). Serfling's contention that WULA is responsible for the size of the loss because it sold the Gurnee property at a fire-sale price is misguided. He bases his assertion that the price was unreasonably low on the appraisal of $15 million he obtained for the property two years before WULA sold it for $5 million. Serfling conveniently ignores that he obtained that appraisal by providing Schmidt, the appraiser, with a fraudulent lease guaranteeing monthly rental payments of $125,000 from Ford. The district court appropriately relied on the sale price as evidence of the property's value. *See United States v. Radziszewski*, 474 F.3d 480, 487 (7th Cir. 2007).

Serfling's second challenge to the loss calculation is trivial. He argues that the value of the property should have been subtracted from a minuend of $11,515,781 (the

---

[2]  We use the November 2001 Sentencing Manual.

loan amount minus costs, fees, and interest), instead of $11.75 million. But the difference between the two figures is negligible; either results in a loss amount exceeding $2.5 million and the attendant 18-level adjustment. U.S.S.G. § 2B1.1(b)(1)(J).

Serfling also contends that it was error to include in the gross receipts he derived from his fraud the value of the Gurnee property because he did not gain control or ownership of the property as a result of the transaction. The 2-level adjustment at issue applies when a defendant, individually, "derived more that $1,000,000 in gross receipts from one or more financial institutions." U.S.S.G. § 2B1.1(b)(12)(A) & cmt. n.9. Serfling argues that the amount of gross receipts must be capped at the amount of loan proceeds disbursed directly to him: $200,000.

The district court, agreeing with the recommendation in the PSR, concluded that the gross receipts exceeded $1 million because Serfling obtained control of the Gurnee property upon the loan's closing. The court found persuasive the decision of the Second Circuit in *United States v. Mingo*, 340 F.3d 112, 114 (2d. Cir. 2003). In that case, the court included in gross receipts the value of real property secured with mortgage loans obtained through false representations. The court rejected the argument that because the defendant did not have full equity in the properties, which were mortgaged, the value of the liens should be subtracted from the property values for purposes of determining gross receipts. *See id.* The court concluded that the plain language of the guideline requires the inclusion of the property's actual value.

*Mingo*, while instructive, is not entirely on point because Serfling does not argue the value of the property should be calculated in a manner that offsets outstanding liens. He argues that he never owned the property; the defendant's ownership of the property was undisputed in *Mingo*.

Serfling contends that he did not "derive property" from the deal because he had a significant preexisting interest in the property. This assertion is simply not borne out by the record. Somewhat inconsistently, Serfin also asserts that he had no working keys to the would-be dealership, so he could not be the property's owner. Notably, Serfling does not dispute the government's assertion that Serfin Trust took title to the property at closing, nor does he suggest who else *did* control the property. Given the evidence in the record, we cannot conclude that the district clearly erred in concluding that Serfling became the owner of the property upon the closing of the loan. The $200,000 Serfling received in cash combined with the value of the property (irrespective of liens) safely exceed $1 million. Serfling has not raised, and has thereby waived, any argument that proceeds to Serfin Trust should not count toward his "individual" gross receipts, *see United States v. Castellano*, 349 F.3d 483, 486-87 (7th Cir. 2003). Accordingly, we uphold the application of the adjustment.

Finally, Serfling argues that his sentence is unreasonably high. The 78-month sentence is within the guidelines range that we have just concluded was properly calculated, and so we presume that it is reasonable. *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005); *see Rita v. United States*, ___ U.S. ___, 127 S.Ct. 2456, 2462-63, (2007). Serfling may rebut the presumption by showing that his sentence is unreasonably long in light of specific factors under § 3553(a). *See Mykytiuk*, 415 F.3d at 608. The sole factor that Serfling points to as compelling a lower sentence is § 3553(a)(6), which requires a sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Serfling contends that an unwarranted disparity exists because he received a harsher sentence than Mary Capri

despite her more extensive criminal history and the fact that she "admitted her intimate involvement in the fraudulent scheme."

We held in *United States v. Boscarino*, 437 F.3d 634 (7th Cir. 2006), that a sentence within a properly calculated guidelines range "cannot be treated as unreasonable by reference to § 3553(a)(6)." *Id.* at 638; *see United States v. Babul*, 476 F.3d 498, 501-02 (7th Cir. 2007). In *Boscarino*, we rejected the argument that the difference between the defendant's sentence and that of his codefendant, who had pleaded guilty and assisted the government, amounted to an unwarranted disparity. *See* 437 F.3d at 638. We emphasized that valid reasons exist for sentencing similar defendants differently, and only *unwarranted* disparities are problematic. *Id.* at 638 ("[A] sentencing difference is not a forbidden 'disparity' if it is justified by legitimate considerations."); *see United States v. Duncan*, 479 F.3d 924, 929 (7th Cir. 2007).

Serfling does not even mention *Boscarino* or the other cases that squarely reject the argument he makes. Nor does he explain why the disparity between his sentence and Capri's is unwarranted rather than justified by legitimate considerations. In fact, he notes her lower guidelines range (46 to 57 months), her acceptance of responsibility, and the district court's finding that "extraordinary" family circumstances weighed in favor of a below-guidelines sentence. These factors suggest that the difference is a natural outgrowth of a sentencing scheme based on individualized factors. *See United States v. Newsom*, 428 F.3d 685, 689 (7th Cir. 2005) ("[O]ne needs to know more than the crime of conviction and the total length of the sentence to evaluate disparities; the specific facts of the crimes and the defendant's individual characteristics are also pertinent."). Serfling's arguments are directed more to the unreasonableness of Capri's

sentence than his own, but if there is any argument that Capri's sentence is too low, it would be for the government, not Serfling, to make. Serfling has not come close to rebutting the presumption that his own within-guide-lines sentence is reasonable.

## III.

Serfling has not demonstrated error with respect to the district court's evidentiary decisions, and he has not shown that any prejudice resulted from the prosecutor's improper remark at his trial. Furthermore, his sentencing arguments lack merit. We therefore AFFIRM the convictions and sentence.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*