In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 05-1120 & 05-1798

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ODELL CORLEY,

*Defendant-Appellant.*

———————

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division
No. 02 CR 116—**Rudy Lozano**, *Judge.*

———————

ARGUED DECEMBER 11, 2006—DECIDED MARCH 24, 2008

———————

Before ROVNER, WILLIAMS, and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge*. The defendant-appellant Odell
Corley was convicted of a number of charges including
bank robbery and capital murder, and was sentenced to
death on October 27, 2004. He appeals his convictions
and his sentence.

The convictions stemmed from Corley's actions with
others on August 27, 2002 in robbing a bank, and killing
two persons and paralyzing a third at the bank. The
robbery attempt was planned in advance and was to
involve Corley and four others, Edward Johnson, Andre

McGregor, Danyass Gay and Jeanna Ramsey. The roles each would take in the robbery were defined, with McGregor driving and Corley and Johnson entering the bank, and with disguises which consisted of makeup to lighten their complexions, sunglasses, oversized clothes and a bandana. On August 27, Johnson and Ramsey went to McGregor's house. Corley met them there, and they drove Corley in a blue Cadillac to pick up a tan car which they planned to use for the robbery. They stopped at a gas station, where Corley used a phone to call in a bomb threat against area schools in an effort to divert the police.

Once they arrived at the bank, McGregor parked the tan car in the back and Corley and Johnson approached the bank. Corley entered the bank immediately, but Johnson spotted the security guard inside the bank and froze outside the bank. The security video tape captured much of what happened next. The security guard, Keith Hill, went to the door of the bank as Corley was entering. Corley pushed the door in and fired his .45 caliber semi-automatic handgun at Hill as he entered, shooting Hill twice from close range and leaving him paralyzed. Corley than headed towards the teller stations and fatally shot teller Chandler Simpson. Corley leapt over the counter, leaving a palm print, and shot teller Kay Peckat who was crouched behind it. She died as a result of the two bullet wounds. At this point, Corley had only been in the bank for seven seconds. At Corley's command, Johnson entered the bank and retrieved Hill's gun. Upon discovering that the vault was locked, Corley ran out of the bank with an empty bag. The entire ordeal took only 29 seconds.

In the getaway vehicle, Corley berated Johnson for freezing at the bank entrance, and reported that he had

shot some people. The three men then met with Ramsey at the blue Cadillac. They removed their disguises and threw the makeup rags, shirts and sunglasses into the tan car and then doused it with gasoline, setting the car on fire. They then left the area and ultimately split up, with Corley taking the guns with him.

At trial, Johnson testified against Corley, and the prosecution also introduced the videotape from the bank, as well as the palm print left at the scene. The prosecution sought the death penalty, and therefore the *voir dire* included questions concerning the juror's views regarding the death penalty, and the prospective jurors' exposure to publicity regarding the death penalty. In addition, because the defendants in the case are African-American and the victims were white, the prospective jurors' were also queried on their racial views. Corley now raises myriad challenges to both his trial and sentencing, which we address in turn.

## I.

The first issue we consider is whether the government exercised its peremptory challenges in a discriminatory manner. The Supreme Court in *Batson v. Kentucky*, 476 U.S. 79 (1986), reaffirmed that the Equal Protection Clause prohibits a prosecutor from using a peremptory challenge to strike a prospective juror based on race, noting that the harm inflicted by such an action extends beyond the defendant to the entire community, and undermines public confidence in the fairness of our judicial system. *Id.* at 87. To identify and assess such discriminatory practices, *Batson* set forth a three-part test for analyzing such claims: first, the defendant must establish a prima

facie case of racial discrimination by showing facts and circumstances that raise an inference of discrimination, 476 U.S. at 93-94; second, once the prima facie case is established, the government must offer a race-neutral explanation for the challenged strike, *id.* at 97; and third, the defendant may then offer additional evidence to demonstrate that the proffered justification was pretextual or to otherwise establish that the peremptory strike was motivated by a discriminatory purpose, *id.* at 98. *United States v. Stephens*, 421 F.3d 503, 509-10 (7th Cir. 2005). In meeting that burden, a defendant may introduce evidence of a pattern of strikes against members of a particular race, disparate questioning by the prosecutor in voir dire, and evidence that the prosecutor's proffered reason for a challenged strike of a prospective juror of a particular race applied just as well to an otherwise-similar prospective juror of another race who was permitted to serve. *Miller-El v. Dretke*, 545 U.S. 231, 240-41 (2005); *Coulter v. McCann*, 484 F.3d 459, 464-465 (7th Cir. 2007); *Stephens*, 421 F.3d at 512-13.

Corley focuses on the challenge to one juror, R.G., who was an African-American prospective juror struck by the prosecutor. The prosecutor provided race-neutral reasons for that strike, namely that R.G. had made a number of statements on the Juror Questionnaire about the impact that DNA had on his decision regarding the death penalty. First, in response to a question asking him to describe his feelings about the death penalty in his own words, R.G. stated:

> I wonder how many people have been put to death wrongly since the developed science that has proven individual[s] on death row not guilty? Long before the science of DNA I had debates with a good friend

> about the death penalty, after the development of DNA science I had to call and change my position.

In response to questioning during voir dire, R.G. acknowledged that in those debates with the friend, he had been arguing in favor of the death penalty and his friend was opposed to it, but that after the development of DNA science he had to call the friend and change his position. R.G. mentioned DNA evidence again later in the questionnaire in response to a question as to whether he had seen any recent publicity regarding the death penalty, stating "The release of individuals off death row after DNA testing prove they were not guilty [in] Illinois." Finally, in response to another inquiry on that questionnaire as to whether African-Americans are treated differently by the criminal justice system and police officers, he answered yes and stated "the number [of] African-Americans on death row that have been freed years later for crimes that they did not commit without anyone ever facing the responsibility for the time that they have lost in [their] lives." Moreover, in response to further questioning regarding whether the science of DNA had changed his view of the death penalty, R.G. stated that it might make it a little fairer because there could be a more definite conclusion, whereas there "might have been some questions about how many people actually went to their death that might have been innocent. But science couldn't prove it at the time." Therefore, R.G. had repeatedly made significant comments that expressed his concern that innocent people had been sentenced to death and the importance of DNA evidence. That was of critical importance to the prosecutor in this case because, as the court and the defense counsel knew, the prosecutor lacked any DNA evidence linking Corley to the crime.

The defense argues that white jurors M.S. and B.K. with similar concerns were not challenged, but those jurors did not express similar concerns. The prosecutor's objection to R.G. was based specifically on his repeated focus on the importance of DNA evidence. M.S. did not mention DNA evidence in her questionnaire at all, and B.K. responded to the question as to any publicity she had seen concerning the death penalty "Recent death penalty reversals as a result of DNA evidence." Neither expressed the degree of concern exhibited by R.G., nor did they indicate that it had caused them to reconsider their position on the death penalty. B.K. expressed the need for "compelling" evidence or a "preponderance of evidence" of guilt before she would impose the death penalty, but that is not the same as wanting DNA evidence in order to have confidence in a verdict, which is what R.G. seemed to imply (not to mention that those standards—which the defense counsel argued as imposing a heightened standard—are lower than the reasonable doubt one).

The prosecutor identified a second concern in challenging R.G., which was R.G.'s statement that when he was young, a close family member was accused of robbery and imprisoned for years, and that it affected him because someone he looked up to had been taken away from him and he believed it was unfair. R.G. stated that the relative acknowledged that he was wrong when R.G. was older. Even though R.G. expressed that he later found out the relative was guilty, he nevertheless spent years believing the justice system was unfair to a person important in his life. The prosecutor was entitled to believe that the experience could have had an impact on him that persisted even after the relative's guilt was discovered. The district court did not clearly err in holding that the

peremptory challenge was not exercised in a discriminatory manner.

Although Corley also argues that the court did not follow the three-step *Batson* process, the record belies that assertion. The defense counsel began by pointing to factors that indicated that race could have been a factor in the challenge. When the argument by defense counsel seemed to veer into whether a race-neutral reason was possible, the district court cut off the counsel, asking whether he was arguing the question of pretext or whether he was still providing a basis to require the government to respond. That sequence recognized the progression from the first to the second step of the *Batson* process. The government then proffered its race-neutral reasons, namely R.G.'s focus on the impact that DNA evidence had on his decision regarding the death penalty, as well as the concern with R.G.'s experience as a child being separated from a person whom he looked up to and his childhood perception of an unfair judicial system.

The district court did not then explicitly declare that the government had provided a race-neutral reason and that the inquiry would proceed to step three. That is because defense counsel proceeded directly into the argument that the reasons were insufficient and that similarly-situated white jurors were treated differently. The ensuing discussion was clearly a step three argument, and there is no formalistic requirement that the steps be labeled and explicitly delineated, as long as it is clear from the record that each step was in fact considered. Here, the prosecutor provided facially neutral reasons, and therefore the defense counsel properly progressed to the final step of attempting to prove that the strike was discrim-

inatory. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995) (noting that any race-neutral reason is sufficient at this step, even if not persuasive or even plausible.) The district court proceeded to hear Corley's arguments regarding the similarly-situated jurors as well as the government's contention that R.G.'s statements were different in nature and not comparable. *See Coulter v. McCann*, 484 F.3d 459, 465 (7th Cir. 2007) (noting that at step three the court weighs the evidence to determine if the non-discriminatory reason is credible, including consideration of similarly-situated jurors permitted to serve.) The court then held that the government had provided race-neutral non-discriminatory reasons based on the DNA statements and the comments regarding the relative with the conviction that R.G. had believed was unfair. Although it would be more helpful for the district courts in these *Batson* cases to explicitly make credibility determinations, and perhaps state on the record the basis for rejecting the comparisons with the similarly-situated jurors, there is no ambiguity in this record. The court accepted the government's argument, that determination is supported by the record, and it is not clearly erroneous.

## II.

Corley next argues that the district court abused its discretion and violated his Fifth and Eighth Amendment rights in allowing the government to introduce evidence of unadjudicated conduct at sentencing. In the penalty phase of the trial, the prosecution sought to prove Corley's future dangerousness as a non-statutory aggravating factor. Specifically, the factor of "future dangerousness" entailed evidence that

the Defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to others, as demonstrated by proof of a continuing pattern of violence, the Defendant's low rehabilitative potential, and/or his mental condition.

Penalty Phase Instruction # 11. Toward that end, the government presented evidence that Corley was responsible for the 1988 murder of Wanda McNeal in Atlanta, Georgia. McNeal had been set on fire while sleeping on a couch on a porch, and the resultant injuries were fatal. Corley had not been tried for that crime, and therefore it constituted unadjudicated conduct. The jury in this case found beyond a reasonable doubt both that Corley murdered McNeal, and that the government had proven beyond a reasonable doubt the existence of that non-statutory aggravating factor of future dangerousness.

First, Corley challenges the introduction of evidence regarding that unadjudicated conduct as contrary to the statutory framework of the Federal Death Penalty Act (FDPA), which contains no provision expressly allowing the consideration of unadjudicated conduct. Corley points out that the FDPA, in listing factors that a juror should consider as aggravating, repeatedly refers only to "convictions." It is a stretch, however, and one not supported in law, to contend that the FDPA's recognition that prior convictions are relevant factors in aggravation should be read as precluding the consideration of other actions by the defendant that did not result in a trial or conviction. In fact, the FDPA specifically provides that the jury "may consider whether any other aggravating factor" supports a death sentence, 18 U.S.C. § 3592(c), and states that at the sentencing hearing "information may be

presented as to any matter relevant to the sentence . . . ." 18 U.S.C. § 3593(c). Corley cannot demonstrate that the FDPA's references to convictions meant to preclude consideration of actions that had not yet resulted in convictions, particularly given the widespread acceptance that evidence of future dangerousness is indeed a relevant consideration in the sentencing process.

Similarly, Corley cannot succeed on his claim that the admission of evidence pertaining to unadjudicated crimes violates the Fifth and Eighth Amendments. The notion that consideration of unadjudicated conduct is inherently unconstitutional has been rejected by the Supreme Court and by a plethora of circuit courts that have considered it. In *Williams v. New York*, 337 U.S. 241 (1949), the Court upheld consideration of unadjudicated conduct in the penalty phase of a capital case. Corley argues that aspects of the *Williams* decision have since been rejected in subsequent decisions. *See Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976) (holding, contrary to *Williams*, that the death penalty is qualitatively different from a sentence of imprisonment) and *Gardner v. Florida*, 430 U.S. 349, 357-58 (1977) (concluding that the due process clause applies to capital sentencing). However, since those decisions were issued, the Court has again repeated that holding of *Williams*, noting that it had previously upheld the constitutionality of considering a defendant's past criminal behavior even if no criminal conviction resulted from that behavior. *Nichols v. United States*, 511 U.S. 738, 747 (1994). Although Corley emphasizes that *Nichols* was not a capital case, nothing in *Nichols* indicated that the Court considered the *Williams* holding to be limited, or that it was no longer good law as to cases involving the death penalty.

Moreover, every circuit to consider the issue has held that unadjudicated conduct may be considered in the process of assessing aggravating factors, and many courts have specifically recognized the relevance to the factor of future dangerousness. *See, e.g.*, *Cummings v. Polk*, 475 F.3d 230, 238 (4th Cir. 2007) (noting that there is authority in the 4th Circuit and the Supreme Court that evidence of unadjudicated crimes may be utilized in a capital sentencing trial); *Brown v. Dretke*, 419 F.3d 365, 376-77 (5th Cir. 2005) ("admission of unadjudicated offenses in the sentencing phase of a capital trial does not violate the eighth and fourteenth amendments," nor does the Constitution require "that unadjudicated extraneous offenses be proved beyond a reasonable doubt"); *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001) ("the admission of evidence of unadjudicated prior offenses at a capital sentencing hearing is constitutionally permissible and not inherently prejudicial"); *United States v. Cooper*, 91 F. Supp. 2d 90, 106-108 (D.D.C. 2000) (noting that numerous federal courts and the majority of states have held that the use of unadjudicated criminal activity is constitutionally permissible in a capital sentencing hearing, and listing cases). We have not directly addressed the issue, although we implicitly reached the same holding in *Pitsonbarger v. Gramley*, 141 F.3d 728, 735-36 (7th Cir. 1998), in stating that the due process clause does not require that a jury find that uncharged criminal conduct occurred beyond a reasonable doubt before it can consider that conduct for capital sentencing. We now make explicit that we join those circuits in recognizing that it is not inherently unconstitutional for a jury, in assessing the aggravating factor of future dangerousness, to consider unadjudicated criminal conduct.

That does not mean that such conduct may be considered in all cases. As Corley and the government recognize, the district court in determining whether such information may be considered must consider a number of factors, including the reliability of the evidence, the prejudicial and probative impact of the evidence, and the burden of proof both for determining reliability and for a jury to determine whether the conduct may be considered. In this case, the district court recognized the significance of those factors in assuring that Corley's rights were protected. Before the court would allow the jury to hear the evidence, the court conducted a two-day hearing to determine the reliability of the evidence against Corley. The court, applying the standard agreed to by the parties, found "that the evidence linking Defendant to the Atlanta murder was sufficient to allow a reasonable jury to find, beyond a reasonable doubt, that Defendant committed the Atlanta murder." Although Corley disputes that finding, he essentially asks us to reweigh the evidence, attributing greater weight to some testimony over other testimony. That is not the province of this court. It is not enough to demonstrate that a jury could properly have found that Corley was not responsible for the murder. The evidence presented in support of the murder claim was reliable, and was sufficient to allow a jury to find guilt beyond a reasonable doubt. It included witnesses who placed Corley at the scene of the crime at the time of the fire, a gas can found in his car, a bottle on a lanyard similar to one he had possessed that was found at the scene and emitted gas fumes, and incriminating statements made by Corley.

The court further found that the probative value of the Atlanta evidence was not outweighed by the potential

for creating prejudice, confusing the issues, or misleading the jury. Corley disputes that conclusion as well, maintaining that the danger of "prejudicial spillover" was so great that evidence of the unadjudicated murder should not have been admitted. Essentially, Corley argues that a jury which has just convicted a defendant of a capital crime is unlikely to be impartial in considering the defendant's guilt as to the unadjudicated offense. This argument would apply to all instances in which unadjudicated offenses are raised in the penalty phase of a capital case. But as we have already noted, such use has already been upheld by the Supreme Court and every circuit to consider it. Corley ultimately relies only on an unpublished district court case, *United States v. Gonzalez*, 2004 WL 1920492 (D. Conn. Aug. 17, 2004), for his argument, but even under the reasoning of that case his argument fails. In that case, the court noted that Gonzalez would be "uniquely prejudiced" by the introduction of evidence of four unadjudicated murders as aggravating factors because of the nature of the murders and the similarity to the underlying capital murder. *Id.* at *6. Specifically, the four additional murders introduced as aggravating factors, while unrelated to the capital murder, were not readily separable because they arose from factual patterns similar to the underlying crime, thus increasing the risk that the jury would use its finding of guilt on the capital offense in its determination of guilt in the penalty phase. *Id.* The capital crime involved a murder-for-hire in which Gonzalez shot the victim point blank from the back of a motorcycle. *Id.* at *5. The four additional unadjudicated offenses were all murders, all alleged to have been committed by Gonzalez as a passenger on a motorcycle, and three out of four were murders-for-hire. *Id.* at *6. Faced with those unadjudicated offenses

that, though unrelated, were factually similar, the court concluded that the danger of prejudicial spillover was too great. *Id.* That is a strikingly different situation than the one presented here. The only similarity between the unadjudicated conduct and the capital crime is that they both involved murder. There is no further factual similarity between the underlying offense of murders of persons not known to him with a gun in the course of a bank robbery, and the unadjudicated claim of murder by setting on fire a person with whom he had a personal relationship at a residence. Accordingly, Corley has failed to demonstrate that the district court should have excluded the evidence based on the prejudicial nature of the evidence.

The district court took further steps to protect the defendant from potential unfair prejudice in its instructions to the jury. The jury was instructed that in order to consider the evidence related to McNeal's homicide in assessing the aggravating factor, the jury must first find beyond a reasonable doubt the two elements of the crime (that the defendant acted unlawfully and with malice aforethought and that while so acting, the defendant caused the death of McNeal.) We note that whether that standard is required is not an issue in this case. Its relevance is in its reflection of the protections put in place by the district court to cabin the use of unadjudicated conduct in order to minimize the risk of prejudice. The court further instructed the jury that even if it found beyond a reasonable doubt that the defendant murdered McNeal, it need not conclude that the government had established the aggravating factor beyond a reasonable doubt. The special verdict form required the jury to separately record their findings on the questions as to whether the

government had (1) proven beyond a reasonable doubt that the defendant murdered McNeal, and (2) proven beyond a reasonable doubt that "the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to others, as demonstrated by proof of a continuing pattern of violence, the defendant's low rehabilitative potential, and this fact or circumstance tends to support imposition of the death penalty."

In sum, the district court was cognizant of the perils of reliance on unadjudicated conduct, and the procedures utilized by the district court insured that only reliable evidence that convinced a jury of guilt beyond a reasonable doubt was considered. In those circumstances, Corley cannot demonstrate a violation of his constitutional rights.

Nor can he succeed in his related claim that the district court erred in allowing the government to introduce the two photos of McNeal's charred body post mortem. Corley argues that the prejudicial impact of the gruesome photos outweighed any minimal probative value, and therefore that the admission of those photos was error which played a substantial role in the jury's decision to sentence Corley to death. Under the Federal Death Penalty Act, during the penalty phase "information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). We will reverse a district court's determination only for an abuse of discretion. *United States v. Johnson*, 223 F.3d 665, 674 (7th Cir. 2000). In this case, the government possessed ten or fifteen photos depicting McNeal's injuries, and the district court allowed the admission of two of them. Those

pictures depicted the state of McNeal's body after having been set afire, and were probative of the manner of death, the extent of the injuries, and the viciousness of the attack. Moreover, McNeal lived for a brief time after the attack and, by depicting the extent of the injuries, the photographs provided context for the jury in determining McNeal's condition when she made statements regarding her attackers, which Corley relied upon to argue that others were responsible for the murder. The court recognized that the government was seeking admission of only two of the ten or fifteen photographs in its possession, and held that the prejudice did not outweigh the probative value. Those two admitted photos pale in comparison to photos allowed by other courts, in both number and character. *See, e.g.*, *United States v. Sampson*, 486 F.3d 13, 43 (1st Cir. 2007) (FDPA case upholding the admission of autopsy photographs because they shed light on the manner in which each victim was killed; noting that although the government had other means of making its points, "within reasonable limits, the prosecution—even in a capital case—is entitled to present its case through the evidence it deems most appropriate."); *United States v. Fields*, 483 F.3d 313, 355-56 (5th Cir. 2007) (FDPA case upholding the admission of 32 photos, some of them "shocking," and noting that "caselaw indicates that admitting gruesome photographs of the victim's body in a murder case ordinarily does not rise to an abuse of discretion where those photos have nontrivial probative value.") We find no abuse of discretion in the decision to admit the two photos here.

III.

Corley further argues that he was denied his rights under the Eighth Amendment and his Fifth Amendment

right to due process by the government's misconduct at the trial. Specifically, he points to two instances of alleged misconduct during cross-examination in the trial, and one during the government's rebuttal argument at sentencing. The first instance of alleged misconduct involved the cross-examination of Corley regarding his alibi defense. Corley maintained that on the day of the bank robbery, he arrived at his grandmother's home around noon and proceeded to cut her grass. He testified that while he was there, his grandmother informed him that she had seen a story about the robbery on the news. The government asked Corley if he was aware that there were no news reports regarding the robbery until the late evening hours of the day. Defense counsel objected, arguing that there were no facts in evidence as to when the news reports were broadcast, and the court overruled the objection. The government then proceeded to ask a series of questions regarding the time that the robbery occurred and that emergency personnel responded, apparently to establish a timeline indicating that the report could not have appeared on the midday news. The district court then sustained Corley's objection, ending that line of questioning.

At the conclusion of the evidence, Corley moved for a mistrial, and the government responded that it was merely drawing inferences from facts in evidence. Subsequently, the district court offered a curative instruction that provided:

> Ladies and gentlemen, questions were raised during the trial regarding the broadcast of news reports concerning the robbery. The question of a lawyer is not to be considered by you as evidence. It is the witnesses' answers that are evidence—not the ques-

tions posed by the lawyers. At times, a lawyer on cross-examination may have incorporated into a question a statement which assumed certain facts to be true, and asked the witness if those facts were true. If there is no evidence in the record proving those assumed facts to be true, then you are not to consider those facts simply because they were contained in the lawyer's question.

In light of that curative instruction, we cannot conclude that the questioning denied Corley a fair trial. In reviewing a claim of prosecutorial misconduct, we consider first whether the challenged remark by the prosecutor was improper, and second, whether it prejudiced the defendant. *United States v. Serfling*, 504 F.3d 672, 677 (7th Cir. 2007). In determining prejudice, we examine a number of factors, including: (1) whether the prosecutor misstated the evidence; (2) whether the remark implicated a specific right; (3) whether the defendant invited the response; (4) the efficacy of curative instructions; (5) the defendant's opportunity to rebut; and (6) the weight of the evidence. *Id.* "Ultimately, the inquiry turns on whether the improper statement 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id., quoting Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation marks and citation omitted).

There was some evidence of record to allow an inference that a mid-afternoon television report did not occur, but the question overreached in that it indicated as a fact that no such news report occurred. Nevertheless, any confusion potentially demonstrated by the questions was ameliorated by the very specific curative instruction, which identified this particular line of questioning and instructed the jury that it could not credit the assumption

in that question, but must rely solely on admissible evidence. "As always, we presume that the jury followed the court's instructions, absent evidence of an 'overwhelming probability' that it was unable to do so." *Serfling*, 504 F.3d at 677. There is no reason to believe that the jury failed to follow the instruction here. Moreover, the evidence against Corley was substantial, and we have considered that as the factor "most important" to the prejudice inquiry. *Id.* Accordingly, Corley has failed to demonstrate that the questioning violated his constitutional right to a fair trial.

The second allegation of alleged prosecutorial misconduct concerns cross-examination regarding Corley's financial situation. Corley testified on direct examination that he did not have any salaried position but was self-employed foremost as a portrait artist, but also earned income with the purchase and sale of cars, detailing vehicles, and handyman work. On cross-examination, he testified that he was living at his mother's house at the time. When asked if he was paying her rent, he stated that he had not been there for even a month, and that he had told his mother that he was not going to live with her, but would just store his belongings there. He then testified that he was going to get himself "seven girlfriends and have seven different places to sleep at every night." The government then queried whether he was "just that good, that seven women would take you in?" to which he responded affirmatively. A back-and-forth then ensued in which he was questioned as to the identity of these women, to which he responded that he thus far found only one, although he also maintained that he had used such a living arrangement in the past. Corley argues that the line of questioning as to his personal life vio-

lated a duty to protect a witness from questions that go beyond cross-examination merely to humiliate. But the questioning was relevant to Corley's financial situation, and whether he had a motive to rob a bank because he was in poor financial straits. The testimony indicated that he lived with his mother and did not pay rent, but Corley raised the unconventional living arrangement in an apparent attempt to indicate that the situation did not indicate that he was pressed for money. The government properly explored that testimony to reveal that Corley was not being truthful as to his plans, and that he indeed had a motive to rob a bank. There was no error here.

Corley also challenges a statement made by the government in closing argument ostensibly to counter the impact that the emotional testimony by Corley's mother may have had on the jury: "Because there was no histrionics, because there was no raw emotion, don't assume for a minute that the sentence of life will be perceived as justice by the victims of this case." Corley argues that the statement was improper because it was a "description of both the State's and family's characterization of the crime." Corley does not elaborate and the challenge is fairly ambiguous. The sentence could be read as asking the jury not to draw any inferences from the lack of emotions in the testimony by the victims' families, as compared with the very emotional testimony of Corley's mother. Even if it is read, as it well could be, as indicating that the victims will not perceive a life sentence as just, the objection to the statement was vague; in giving the basis for his objection, Corley's attorney merely stated "I thought we had eliminated that argument earlier in our discussions." He was referring to an agreement between the government and defense that the government would not elicit from penalty-phase witnesses any testimony

regarding their opinions on whether Corley should receive the death penalty. The court was not apprised of that agreement, nor did defense counsel explain it or seek a sidebar. Moreover, although defense counsel subsequently sought a mistrial, counsel did not seek any curative instruction.

Corley appears to base his challenge on the Supreme Court's holding that it is a violation of the Eighth Amendment for family members of a victim to testify as to the appropriate sentence. *Booth v. Maryland*, 482 U.S. 496, 502 (1987), *rev'd in part by Payne v. Tennessee*, 501 U.S. 808 (1991); *Payne*, 501 U.S. at 830 n.2; *Welch v. Sirmons*, 451 F.3d 675, 701-04 (10th Cir. 2006). But here we are faced not with any such testimony, but with a statement by the government at closing argument. Corley has not presented any argument addressing such statements by the prosecutor at closing argument. We conclude that the one, isolated, ambiguous statement by the government in this case is not reversible error in the context in which it was made and in context of the closing argument and limiting instructions as a whole. In fact, Corley does not really argue that the statement alone is reversible error, but asks us to consider it in combination with the alleged errors in cross-examination. As discussed above, the cross-examination was either proper or was properly handled with the limiting instruction, and therefore that argument must fail.

Finally, Corley argues that his constitutional rights were violated by the refusal to give a residual doubt instruction or to allow a residual doubt argument. This claim is rather bizarre, because Corley argues on appeal that he should have been able to argue residual doubt about the unadjudicated murder of McNeal, not that he should have been able to argue residual doubt about the

offense for which he was convicted. His proposed residual doubt instruction that was apparently rejected, however, addressed only residual doubt as to his guilt for the offense itself, and was unrelated to the unadjudicated murder introduced as an aggravating factor. Moreover, Corley never explains what argument as to residual doubt he wanted to make and was precluded from making. The evidence regarding the unadjudicated murder of McNeal was presented at sentencing, and Corley had the opportunity at that time to challenge the evidence. The utility of a residual doubt instruction at that stage is questionable. Furthermore, it appears that this claim that he should have been able to argue residual doubt, and to have a residual doubt instruction as to the unadjudicated murder, was never raised in the district court. Corley specifically disavows any residual doubt argument as to the guilt for the offense of conviction at this time, and therefore this claim must fail. We note that even a residual doubt argument relating to the offense of conviction would be likely to fail. In *Oregon v. Guzek*, 546 U.S. 517, 523 (2006), the Supreme Court held that the Constitution does not give a capital murder defendant the right to present new alibi evidence at resentencing that was inconsistent with his prior conviction. The jury in this case already heard any evidence introduced at trial casting doubt on his guilt, and therefore it is difficult to envision how denying a residual doubt argument could be reversible error. We need not decide that, however, because Corley raises no challenge on appeal related to residual doubt as to the offense of conviction. There is no reversible error here.

The conviction and sentence are AFFIRMED.