FILED
United States Court of Appeals
Tenth Circuit

April 29, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

No. 09-2046

LARRY LUJAN,

Defendant-Appellee.

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR 05-0924 RB)**

David N. Williams, Assistant United States Attorney (Gregory J. Fouratt, United States Attorney, with him on the briefs), Albuquerque, New Mexico, for Plaintiff-Appellant.

Marc. H. Robert, Assistant Federal Public Defender, Las Cruces, New Mexico, for Defendant-Appellee.

Before **HENRY**, Chief Judge**, EBEL,** and **GORSUCH,** Circuit Judges.

**EBEL**, Circuit Judge.

Defendant-Appellee Larry Lujan is charged with the capital crime of kidnapping

resulting in the death of a victim, in violation of 18 U.S.C. § 1201(a)(1), for the

kidnapping and subsequent murder of Dana Joe Grauke II in March 2005 (the "Grauke

murder"). In its pursuit of the death penalty, and for purposes of the sentencing phase only, Appellant-United States sought to have evidence admitted that Lujan had previously committed a double homicide in New Mexico in December 1998 (the "Chamberino murders" or the "double homicide"). The United States asserted that this double homicide evidence would prove Lujan's future dangerousness—a non-statutory aggravating factor for the death penalty. Lujan argued that this evidence cannot be admitted because it is unfairly prejudicial, particularly because Lujan has been charged by New Mexico with the Chamberino murders but not convicted of them. The district court agreed with Lujan and ordered the evidence excluded pursuant to 18 U.S.C. § 3593(c) of the Federal Death Penalty Act of 1994. The United States filed an interlocutory appeal of this order. Under 18 U.S.C. § 3731, we have jurisdiction to hear an interlocutory appeal of a district court's pretrial order excluding evidence from the sentencing phase. See also United States v. Pepin, 514 F.3d 193, 201-02 (2d Cir. 2008) (exercising jurisdiction under 18 U.S.C. § 3731 to review on interlocutory appeal an order excluding from the penalty phase evidence proffered by the government). Exercising that jurisdiction, we reverse the district court's order and remand for further proceedings consistent with this opinion.

## BACKGROUND

The details of the Grauke murder as alleged by the United States depict a gruesome scene in which Lujan (and his cohorts) severely beat Grauke over a significant period of time, sexually assaulted Grauke, and engaged in other acts to terrify and isolate

2

Grauke.  The handful of allegations necessary to understand this case begin when Lujan[1] visited Grauke at his home to collect on a drug debt.  Lujan physically assaulted Grauke and a friend and ransacked Grauke's home.  Lujan then forced Grauke into a truck and took him to a friend's home, but before leaving, threatened to kill Grauke's friend if he told anyone what had happened.  At the friend's house, Lujan continued to beat Grauke before forcing him into another car to visit ATMs and phone booths in an unsuccessful effort to obtain payment on the drug debt.  Later, Lujan and his friend, Eugenio Medina, forced Grauke into the trunk of Medina's car and drove to another friend's house.  At this point, Lujan removed Grauke from the trunk, blindfolded him, bound his hands, and placed him into the "luggage compartment" of a Jeep Cherokee.  (Aplt. App. at 79, 80.)  Lujan then proceeded to his friend Daniel Quintana's home in New Mexico where he ate and drank inside while Grauke remained blindfolded and bound in the Jeep.  Throughout this ordeal Lujan allegedly taunted Grauke, telling Grauke that he would "sell him like a bitch" or kill him and that "[t]his is what happens when you mess with me."  (Id. at 80.)  Sometime after the events of this day, Grauke's body was discovered with a butcher knife that was subsequently connected to Lujan buried between Grauke's feet.

The facts of the Chamberino murders as alleged by the United States are equally gruesome.  As a result of a drug dispute between Lujan and Alfredo Gonzales, in early December 1998, Lujan went to Gonzales's home in Chamberino, New Mexico, at which Juana Olmeda also resided.  Lujan slit Alfredo's throat because of the drug dispute and

[1] Although the United States alleges other individuals were involved, our focus is on Lujan's presence and participation.

slit Olmeda's throat because she witnessed Lujan killing Alfredo. Lujan left the Gonzales home, obtained gasoline, and returned with a friend, Pablo Renteria, only to find Alfredo still alive. At this point, Lujan repeatedly kicked Alfredo in the head and body, telling him "[t]his is what happens when you mess with me." (Id. at 90.) Lujan then searched the house for drugs and, ultimately, poured gasoline over the victims' bodies, including the apparently still-breathing Alfredo, and set them on fire. Lujan then absconded to El Paso, Texas, where he called Daniel Quintana and told him what happened. The victims' eleven-year-old daughter discovered the bodies the next afternoon.

In the sentencing phase of the Grauke murder, assuming there is a conviction, the United States would like to introduce at least the following evidence to prove Lujan committed the Chamberino murders: (1) evidence that a bloody rag found on Gonzales's body contained DNA matching Lujan's DNA, but did not contain the DNA of the victims; (2) testimony of Daniel Quintana about how he had been with Lujan prior to the homicides, that Lujan had become upset with Gonzales over drugs, and that Lujan had disappeared for a while at the time the homicides occurred; (3) a statement from Pablo Renteria about what he saw when he returned with Lujan to the Gonzales home; and (4) testimony from a medical examiner as to the wounds and manner of the victims' deaths. The United States offered to sanitize some of this evidence, including Renteria's statement. The Government also proposed a summary witness as an alternative. Nonetheless, the court excluded from the sentencing phase all evidence related to the Chamberino murders.

4

## DISCUSSION

### I.     Standard of Review

We review a district court's order excluding evidence from the penalty phase of a capital case under 18 U.S.C. § 3593(c) for an abuse of discretion. See United States v. McVeigh, 153 F.3d 1166, 1211, 1214 (10th Cir. 1998) (providing that "the abuse-of-discretion standard applies to whether the [proffered] evidence was relevant to [a] mitigating factor"), disapproved of on other grounds, and limited by Hooks v. Ward, 184 F.3d 1206, 1227 (10th Cir. 1999); see also Pepin, 514 F.3d at 202 (applying abuse-of-discretion standard).

### II.    Analysis

The precise issue before us is whether the district court abused its discretion by excluding evidence under 18 U.S.C. § 3593(c). Section 3593(c) sets forth the following evidentiary standard for the penalty phase:

> At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. . . . The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a). Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

(emphasis added). Section 3593(c) further requires that the government prove the aggravating factors beyond a reasonable doubt. Id. ("The burden of establishing the

5

existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt.").

Based on § 3593(c), therefore, the threshold limitation on introducing information at a capital sentencing is that such information must be "relevant" to sentencing. Although § 3593(c) fails to define "relevant," we have interpreted it as "the same standard used throughout the federal courts under Federal Rule of Evidence 401." McVeigh, 153 F.3d at 1212-13; see also United States v. Basham, 561 F.3d 302, 331-32 (4th Cir. 2009) (defining § 3593(c) relevance with the Federal Rule of Evidence 401 definition).  Thus, under § 3593(c), information is admissible at a capital sentencing if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [information]."  Fed. R. Evid. 401.

If the district court makes a threshold finding that the information is relevant, § 3593(c) provides that the district court should admit the information unless it concludes that "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."[2]  Section 3593(c) provides the district court with greater discretion to exclude unfairly prejudicial or confusing information than the

_____

[2] Although § 3593(c) imposes only two limitations on the admission of information at sentencing—relevancy and that the probative value not be outweighed by countervailing interests—other limitations, which are not at issue here, may also arise.  See United States v. Fulks, 454 F.3d 410, 438 (4th Cir. 2006) ("Even without the protections of the Evidence Rules, it remains for the [district] court, in the exercise of its judgment and discretion, to ensure that unconstitutional evidence otherwise admissible under applicable evidentiary rules is excluded from trial.") (quotation marks omitted).

district court has during the guilt phase.  This is so because § 3593(c) requires only that the countervailing interests "outweigh" the information's probative value, while Federal Rule of Evidence 403 permits exclusion only where the countervailing interests "substantially outweigh[]" the evidence's probative value.  Compare  18 U.S.C. § 3593(c), with Fed. R. Evid. 403; see also Pepin, 514 F.3d at 204 n.14 ("[T]he test in section 3953(c) gives the court greater power to exclude prejudicial evidence than does the test in . . . Rule 403."); McVeigh, 153 F.3d at 1213 n.40 (noting this distinction, but not elaborating on it).

Here, we agree with the district court that the double homicide evidence was relevant and of considerable probative value to Lujan's future dangerousness.  (Dist. Ct. Ord. at 7 (concluding that evidence of the double homicide "is clearly relevant and probative of the issue of dangerousness").)  If proven, Lujan's commission of a double homicide has a "tendency" to make it "more probable" that he poses a future danger, even if that future danger is limited to a penal setting.  See United States v. Fields, 516 F.3d 923, 942 (10th Cir. 2008) (finding the government "effectively tied [the defendant's] incarceration status to his future dangerousness" by rhetorically asking whether any "one of us would want to be in a cell next to someone who is capable of coldly attacking two innocent people who had done nothing to him").  Moreover, that the double homicide allegedly involved cold, calculated, and brutal conduct has a strong tendency to show Lujan has a propensity for violence and future dangerousness.  See id. (finding sufficient evidence to support finding of future dangerousness where the defendant engaged in a "coldly calculated murder of strangers who could have been

7

anyone"); see also Boyd v. Ward, 179 F.3d 904, 922 (10th Cir. 1999) (finding "evidence of unadjudicated offenses, including several armed robberies," supported jury's finding of the "'continuing threat' aggravator"). Because the double homicide evidence is strongly probative of future dangerousness, its probative value weighs heavily in favor of its admission.

It is at this point, however, that we part ways with the district court. The district court found that the high probative value of the double homicide evidence was outweighed by three countervailing interests: (1) that admission of the evidence would undermine Lujan's presumption of innocence regarding the Chamberino murders; (2) that the evidence would unfairly prejudice the jury against Lujan because of the gruesome nature of the Chamberino murders; and (3) that the evidence would confuse the jury by causing them to consider the double homicide as an independent aggravating factor instead of as evidence tending to prove the non-statutory aggravating factor of future dangerousness. We address each of these reasons separately, and we conclude that none justify the district court's complete exclusion of the double homicide evidence. Therefore, we hold that the district court abused its discretion in excluding the evidence.

## A.  Impinging Lujan's Presumption of Innocence

The district court's primary rationale for excluding evidence of the Chamberino murders from Lujan's sentencing phase for the Grauke murder is that the district court concluded that admitting the evidence would infringe upon Lujan's presumption of innocence for those murders. (Dist. Ct. Ord. at 10 ("[I]t is unreasonable to expect that a jury, which would have just convicted Mr. Lujan of murder, would still be capable of

8

according to him the benefit of a fully operational presumption of innocence with respect to allegations that he committed the Chamberino murders.").) We disagree.

Introducing evidence in the sentencing phase of the Grauke murder trial that tends to prove Lujan engaged in other unadjudicated murders neither undermines, nor even implicates, Lujan's presumption of innocence with respect to those other crimes. The presumption of innocence attaches to each element of a particular <u>offense or charge</u>, not the conduct underlying the offense. That is, if a defendant is charged with a criminal offense, the presumption of innocence "operates at the <u>guilt phase</u> of a trial [on that offense] to remind the jury that the State has the burden of establishing <u>every element of the offense</u> beyond a reasonable doubt." <u>Delo v. Lashley</u>, 507 U.S. 272, 278 (1993) (<u>per curiam</u>) (emphasis added).

In this case, Lujan has been charged only with kidnapping resulting in Grauke's death. The federal government will need to prove each element of that offense beyond a reasonable doubt to convict Lujan.[3] The New Mexico murder charges against Lujan that stem from the Chamberino murders, however, are not a part of the federal Grauke murder charge. That is, the federal government will not introduce evidence that Lujan engaged in the conduct underlying the Chamberino murder charges for the purpose of convicting Lujan of the Chamberino murders. Instead, the federal government seeks to introduce evidence that Lujan committed the Chamberino murders only for the purpose of proving a non-statutory aggravating factor for sentencing for the Grauke murder—namely, future

---

[3] If Lujan is convicted of the offense of kidnapping resulting in the victim's death stemming from the Grauke murder, his presumption of innocence for that charge has been overcome and the presumption "disappears." <u>See</u> <u>Delo</u>, 507 U.S. at 278.

9

dangerousness.  If the sentencing jury in the Grauke trial concludes Lujan committed the Chamberino murders, that conclusion may impact whether the jury finds Lujan poses a future danger.  However, at any subsequent trial on the New Mexico Chamberino murder charges, Lujan will still be presumed innocent of those offenses, notwithstanding the Grauke jury's conclusion at sentencing; the New Mexico jury will still need to find that the state proved each element of those murder charges beyond a reasonable doubt in order to convict him of criminal offenses for the Chamberino murders.

Neither the Supreme Court nor this Court has ever held that admitting evidence at sentencing that tends to prove the defendant engaged in other unadjudicated criminal conduct infringes on the defendant's presumption of innocence pertaining to the other unadjudicated conduct.  Instead, both the Supreme Court and this Court have repeatedly held that the district court may admit evidence of such unadjudicated conduct in the penalty phase of a capital trial without violating the defendant's constitutional rights.  See Williams v. New York, 337 U.S. 241, 244, 252 (1949) (upholding the trial judge's consideration in imposing the death sentence of evidence the defendant had committed burglaries for which he had not been convicted); Nichols v. United States, 511 U.S. 738, 747 (1994) (citing Williams with approval, in a non-capital case, for the proposition that the Court has upheld the constitutionality of considering unadjudicated conduct at sentencing); Hatch v. Oklahoma, 58 F.3d 1447, 1465 (10th Cir. 1995) (per curiam) (acknowledging that while some aspects of Williams' reasoning have been repudiated, its holding that "evidence of unadjudicated crimes in imposing the death sentence does not violate a [defendant's] due process rights" remains the controlling law), overruled in part

10

on unrelated grounds by Daniels v. United States, 254 F.3d 1180, 1888 n.1 (10th Cir. 2001) (en banc); see also Boltz v. Mullin, 415 F.3d 1215, 1230-31 (10th Cir. 2005) (reiterating, in a capital case, that "this Court has flatly held that the admission of evidence of unadjudicated offenses at a sentencing proceeding does not violate due process" (quotations and citation omitted)); Hawkins v. Mullin, 291 F.3d 658, 677-78 (10th Cir. 2002) ("This court has, on numerous occasions, upheld the State's use of unadjudicated offenses in a capital sentencing proceeding."); Smith v. Gibson, 197 F.3d 454, 460 (10th Cir. 1999) ("[A]dmission of unadjudicated bad acts during a capital sentencing proceeding does not violate due process."); Boyd, 179 F.3d at 922 (articulating that Hatch forecloses any argument that a defendant's "Eighth and Fourteenth Amendment rights [are] violated by the introduction of his unadjudicated offenses in the penalty phase" of a capital case).

In fact, even evidence tending to prove that the defendant engaged in criminal conduct for which he has already been prosecuted and acquitted may be introduced at sentencing in a trial charging a separate offense. United States v. Watts, 519 U.S. 148, 156-57 (1997) (holding that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge"); see also United States v. Magallanez, 408 F.3d 672, 684 (10th Cir. 2005) (same). If a district court can even admit evidence of conduct underlying a criminal charge for which the defendant has already been acquitted without violating the defendant's constitutional rights, it follows that the district court can admit evidence of conduct underlying an unadjudicated criminal charge without violating the defendant's presumption of innocence.

11

The district court's conclusion that Lujan's presumption of innocence would be undermined by the admission of the double homicide evidence at sentencing stemmed largely from its reading of Johnson v. Mississippi, 486 U.S. 578 (1988), but we think the district court's reading of Johnson goes too far. In Johnson, a state habeas petitioner had been convicted of murder in Mississippi and sentenced to death. 486 U.S. at 580. One of the aggravating factors the jury found that justified the death sentence was that the petitioner had been previously convicted in New York of a felony involving violence to another person—namely, assault with the intent to commit rape. Id. at 580-81. The "sole evidence" of the assault felony conviction consisted of an authenticated copy of the petitioner's detention after his conviction. Id. at 581. After the death sentence was imposed on the murder conviction, however, the New York Court of Appeals overturned the petitioner's assault conviction. Id. at 582. Reversing the Mississippi Supreme Court, the Supreme Court held that the "federal Constitution require[d] a reexamination of petitioner's death sentence" because of the overturned conviction. Id. at 584. It stated, in pertinent part,

> In its opinion the Mississippi Supreme Court drew no distinction between petitioner's 1963 conviction for assault and the underlying conduct that gave rise to that conviction. In Mississippi's sentencing hearing following petitioner's conviction for murder, however, the prosecutor did not introduce any evidence concerning the alleged assault itself; the only evidence relating to the assault consisted of a document establishing that petitioner had been convicted of that offense in 1963. Since that conviction has been reversed, unless and until petitioner should be retried, he must be presumed innocent of that charge. Indeed, even without such a presumption, the reversal of the conviction deprives the prosecutor's sole piece of documentary evidence of any relevance to Mississippi's sentencing decision.

Id. at 585.

Our analysis coheres with Johnson because we also draw a distinction between a prior conviction for an offense and the conduct underlying that conviction. In Johnson, the aggravating factor was the petitioner's prior felony conviction. Once that conviction was overturned, the jury had no basis for finding that aggravating factor. In this case, however, the aggravating factor is Lujan's future dangerousness, which must be proven beyond a reasonable doubt. 18 U.S.C. § 3593(c). With respect to the Chamberino murders, however, the federal government is simply attempting to prove Lujan engaged in violent conduct that tends to prove he poses a future danger; it is not seeking to prove Lujan has been convicted of criminal offenses for the Chamberino murders.

In sum, the introduction at sentencing of evidence tending to prove a defendant engaged in other unadjudicated criminal conduct neither implicates nor infringes upon the defendant's presumption of innocence with respect to a separate criminal prosecution for charges stemming from that conduct. The district court, therefore, had no legal basis to conclude that the evidence tending to prove Lujan committed the Chamberino murders would undermine Lujan's presumption of innocence for any charges brought against him for those murders. Thus, this reason cannot justify the district court's exclusion of the evidence that Lujan committed the Chamberino murders. See United States v. Commanche, 577 F.3d 1261, 1266 (10th Cir. 2009) ("A district court abuses its discretion when it commits an error of law.").

**B. Unfair Prejudice**

13

The district court's second reason for excluding the Chamberino murders evidence was that the gruesome nature of the Chamberino murders posed too great a risk of causing the jury to reach an impassioned, unreasoned sentencing decision at the Grauke sentencing stage. (Dist. Ct. Ord. at 8 (explaining that the "powerfully emotive" nature of the Chamberino murder evidence "creat[es] a substantial risk that the jury could impose a sentence that is based on, or appears to be based on, emotional considerations rather than instructed reason")).) We disagree and conclude that the district court abused its discretion in concluding that, in this case, any evidence of the double homicide posed such a great risk of unfair prejudice that it outweighed its high probative value.

Section 3593(c) permits balancing of probative value against "<u>unfair</u> prejudice," not all prejudice. The objective of the sentencing stage of a capital case is to allow the jury a full appraisal of the defendant. See <u>Gregg v. Georgia</u>, 428 U.S. 153, 203-04 (1976) (explaining that the jury should receive "as much information as possible when it makes the sentencing decision"). Where the defendant has wide latitude to put on mitigating evidence of his positive characteristics and sympathetic past, there is nothing inherently "unfair" with allowing the government some latitude to present the unfavorable aspects of the defendant, so long as that evidence is relevant to a properly identified aggravator and does not involve gratuitous gruesomeness or inflammatory detail beyond what is necessary to reveal to the jury the true nature of what happened.

The risk that introducing graphic evidence of brutal murders will give rise to emotional reactions poses a legitimate risk of unfair prejudice; however, the vicious, brutal nature of a defendant's conduct is not itself sufficient to justify a complete

14

exclusion of evidence tending to show the defendant engaged in those acts. In the guilt phase of a trial, courts have not allowed defendants to benefit from a Rule 403 exclusion for unfair prejudice simply because their conduct was of a grisly nature. See, e.g., United States v. Soundingsides, 820 F.2d 1232, 1242-43 (10th Cir. 1987) (upholding admission of "undeniably gruesome" autopsy photographs that painted a clearer picture of the victim's injuries, cause of her death, and the defendant's malice aforethought); Pepin, 514 F.3d at 208 (holding that in the guilt phase of a capital case, the district court should not exclude under Rule 403 "[e]vidence that defendant calmly dismembered the victims' bodies shortly after killing them"). While § 3593(c) provides a district court greater discretion to exclude evidence than Rule 403 does, the same principle applies: a defendant should not benefit from the grisly nature of his acts. If the opposite were true, we would have the perverse result that a capital defendant would be better off at sentencing if he previously engaged in heinous acts than if he had engaged in a few barroom scuffles. In effect, the capital defendant would be rewarded for his greater level of violence and the greater seriousness of his prior offenses because the more heinous nature of the acts would make it more likely that the district court would exclude evidence of those acts at sentencing on the grounds of unfair prejudice.

Moreover, the importance of reliable, informed decisionmaking actually counsels in favor of admitting evidence of the double homicide, notwithstanding its grisly nature. The Supreme Court has emphasized that the jury should receive "as much information as possible when it makes the sentencing decision," Gregg, 428 U.S. at 203-04, and that there is an "acute need for reliable decisionmaking when the death penalty is at issue,"

15

<u>Deck v. Missouri</u>, 544 U.S. 622, 632 (2005) (quotations and citation omitted).  Providing the jury with evidence of minor altercations, but not information about the defendant's history of more serious, brutal acts of violence would unduly mislead the jury about the defendant's past conduct and his personal characteristics.  Reliability and accuracy in decisionmaking is actually enhanced by the introduction of evidence that paints a more accurate, fuller picture of the defendant as an individual, irrespective of whether that picture is positive or negative.

Finally, the district court has sufficient discretion to control the presentation of the evidence to minimize adequately the risk of unfair prejudice to Lujan.  The double homicide at issue here certainly entails brutal characteristics.  Two individuals were severely beaten and their throats slit.  One of those individuals was apparently burned alive.  And the allegations suggest Lujan engaged in these acts with a cold, calculated demeanor.  Nonetheless, the government has offered some means of sanitizing this evidence.  While not all of those means may work, the district court can use its discretion to ensure the jury receives the evidence that is highly probative of Lujan's future dangerousness, while at the same time excluding details carrying lesser probative value that is unnecessarily gruesome and poses a real risk of causing <u>unfair</u> prejudice.  <u>See</u> <u>McVeigh</u>, 153 F.3d at 1216 (upholding admission in penalty phase of emotional testimony by numerous victims of the defendant's bombing over claim that such evocative testimony would produce a "capital sentence based on passion rather than reason");  <u>see also</u> <u>United States v. Corley</u>, 519 F.3d 716, 726-27 (7th Cir. 2008) (upholding the district court's admission in a capital sentencing of evidence proving

16

defendant engaged in a separate, unadjudicated murder, including two out of fifteen photos that "depicted the state of [the victim's] body after having been set afire, and were probative of the manner of death, the extent of the injuries, and the viciousness of the attack"); United States v. Sampson, 486 F.3d 13, 43-44 (1st Cir. 2007) (upholding the admission in a capital sentencing of autopsy photographs because they demonstrated the manner of death and were "within reasonable limits" even though the government had other means of demonstrating the manner of death). Therefore, while the district court will have wide discretion in how the double homicide evidence may be presented, it was an abuse of discretion to exclude any evidence of the Chamberino murders given its high probative value and the availability of curative measures.

## C. Juror Confusion

The district court's final reason for excluding the double homicide evidence was its fear that admission would cause juror confusion. Specifically, the district court worried that there was a "substantial risk" that the jury would treat Lujan's alleged commission of the Chamberino murders "as an independent aggravating factor, tending to show that he merits death, rather than as evidence intended to establish the non-statutory aggravating factor of future dangerousness." (Dist. Ct. Ord. at 7.) This reason, however, cannot support the district court's conclusion that the risk of unfair prejudice outweighs the high probative value of the double homicide evidence so as to justify the complete exclusion of that evidence.

The district court correctly identified a concern about juror confusion, but we feel it overstated that concern. In the trial context we regularly allow the admission of

17

evidence for one purpose but not another, and we use a limiting instruction to channel the jury to consider that evidence properly. See Fed. R. Evid. 105 ("When evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."). Although the Chamberino murders evidence at issue here will be admitted in the penalty phase of the trial, the situation is the same as in the guilt phase insofar as the double homicide evidence is being admitted for the limited purpose of proving a non-statutory aggravating factor. See Corley, 519 F.3d at 726 (finding no error from admission of prior unadjudicated offenses in the capital sentencing phase and noting that the court "instructed the jury that even if it found . . . that the defendant murdered [the victim in the unadjudicated homicide], it need not conclude that the government established the aggravating factor beyond a reasonable doubt"). Thus, this concern presents only an issue of properly instructing the jury rather than a reason to exclude the evidence.

We are confident that this experienced and well-respected district court judge can form a jury instruction that will make it clear to the jury that the double homicide evidence is being admitted on the issue of whether the government has proven the non-statutory aggravating factor of future dangerousness and that its consideration is limited to that purpose only. We presume the jury will follow those instructions. See United States v. Castillo, 140 F.3d 874, 884 (10th Cir. 1998) ("A central assumption of our jurisprudence is that juries follow the instructions they receive."); see also Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) ("Absent . . . extraordinary situations, . . . we

18

adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions."); United States v. Hamilton, 587 F.3d 1199, 1219 (10th Cir. 2009) ("Jurors are presumed to follow the judge's instructions." (quotations and citation omitted)). Therefore, we do not think the juror confusion identified by the district court can justify the complete exclusion of the double homicide evidence.

**CONCLUSION**

In sum, we conclude that the district court abused its discretion in excluding all evidence that Lujan committed the Chamberino murders from the sentencing stage of the Grauke murder trial should Lujan be convicted. None of the reasons that the district court offered (either singly or cumulatively) justify a complete exclusion of that evidence.[4] On remand, the district court maintains broad discretion to limit the scope, content, and presentation of the evidence and to instruct the jury as necessary to avoid unfairly prejudicing Lujan. We are confident that the district court judge will perform this task judiciously.

REVERSED AND REMANDED.

---

[4] In our analysis, we examined each of the district court's three reasons as if they were completely separate from the others. Whether those reasons are considered independently or cumulatively, however, they cannot justify a complete exclusion of the double homicide evidence in these circumstances. Moreover, the district court's legally erroneous analysis of Lujan's presumption of innocence for the Chamberino murders permeated its entire analysis. Our conclusion that the district court abused its discretion, therefore, is bolstered by the fact that the district court's legal error spilled over into and polluted its consideration of whether the evidence would inflame or confuse the jury.

19

*United States v. Lujan*, 09-2046

**HENRY**, Chief Judge, dissenting:

The majority's opinion is well-reasoned and lucidly states the governing law. I agree with much of its analysis: future dangerousness must be found beyond a reasonable doubt; prior unadjudicated criminal conduct can be relevant evidence; and the presumption of innocence does not bar the introduction of evidence regarding the Chamberino murders. However, in order to conclude that a distinguished jurist has abused his discretion, I must have a firm conviction that the judge was wrong. In this case, such a conviction eludes me, and I therefore respectfully dissent.

## I. BACKGROUND

Several legal principles are important in this case and are worth restating. First, "the penalty of death is different in kind from any other punishment." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *see also McCleskey v. Kemp*, 481 U.S. 279, 340 (1987) (Brennan, J., dissenting) ("It hardly needs reiteration that this Court has consistently acknowledged the uniqueness of the punishment of death."). "[T]his qualitative difference . . . calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). In my view, this heightened reliability requirement means that a trial judge should exercise particular care in assessing claims of unfair prejudice, as the district court did here.

Next, it is important to emphasize that this court reviews the district court's decision to exclude evidence pursuant to the Federal Death Penalty Act (FDPA) for abuse

of discretion. *See United States v. Corley*, 519 F.3d 716, 726 (7th Cir. 2008) ("We will reverse a district court's determination [of exclusion of evidence] only for an abuse of discretion."). "A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Sells*, 541 F.3d 1227, 1237 (10th Cir. 2008) (quotations omitted), *cert. denied* 129 S.Ct. 1391 (2009). Likewise, this court may find an abuse of discretion where a district court "commits a legal error or relies on clearly erroneous factual findings, or where there is no rational basis in the evidence for its ruling." *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002) (citations omitted).

When applying an abuse of discretion standard of review, we necessarily recognize that there may be no single right answer to the question at hand, but a range of possible outcomes sustainable on the law and facts. "[W]e will defer to the district court's judgment so long as it falls within the realm of these rationally available choices." *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007).

Further, it is important to recognize that the admissibility of prior, unadjudicated conduct is an issue as to which the statute specifically gives the trial judge even greater discretion than usual. Evidence may be excluded "if its probative value is outweighed by the danger of unfair prejudice," 18 U.S.C. § 3593(c), which is distinct from the normal trial standard that requires that it be "substantially outweighed" by the danger of unfair prejudice. Fed. R. Evid. 403. The majority opinion acknowledges as much when it states: "Section 3593(c) provides the district court with greater discretion to exclude unfairly

2

prejudicial or confusing information than the district court has during the guilt phase."

Maj. op. at 6-7.

The statutory framework and plain language indicates a balance, allowing the evidence to be admitted but giving district courts greater deference to exclude it based on the stated factors. As noted by the Seventh Circuit, although it is constitutionally permissible to admit unadjudicated conduct, "[t]hat does not mean that such conduct may be considered in all cases." *Corley*, 519 F.3d at 724; *see also United States v. Grande*, 353 F.Supp.2d 623, 634 (E.D. Va. 2005) ("While unadjudicated conduct may be admissible, it must be carefully monitored to avoid constitutional deficiencies.").

It is also important to note that the admissibility of unadjudicated conduct during the penalty phase has troubled jurists for some time. *See Williams v. Lynaugh*, 484 U.S. 935, 937-38 (1987) (Marshall, J., dissenting) ("Whether a State may introduce evidence of unadjudicated offenses in the sentencing phase of a capital trial is a vexing question."); *Devier v. Kemp*, 484 U.S. 948, 949 (1987) (Marshall, J., dissenting) ("[T]he admission of evidence of unadjudicated crimes at the sentencing phase impinges on the unique constitutional concern for reliability in capital trials."); *United States v. Green*, 372 F.Supp.2d 168, 180 (D. Mass. 2005) ("But surely it cannot be said that a prior *unadjudicated* crime, entirely separate from the charged offense, comes with the substantial procedural safeguards accompanying a prior conviction, or factors intertwined with the trial of the charged offense.") (emphasis in the original).

3

## II. ANALYSIS

The FDPA explicitly states certain factors for the district court to weigh in determining the admissibility of unadjudicated prior offenses: "[I]nformation may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c).

I agree with the majority that Supreme Court precedent instructs that the jury should receive "as much information as possible when it makes the sentencing decision." Maj. op. at 15 (quoting *Gregg*, 428 U.S. at 203-04). There are, however, countervailing considerations, stated in the statute, that the district court reasonably assessed—in particular, concerns about confusion and unfair prejudice. The district court's fine opinion squarely addressed these concerns, as the statute requires. The district court explained that

> the character of the evidence that the United States seeks to introduce at the prospective sentencing phase could have the doubly deleterious effect of inflaming and confusing the jury, thereby creating a substantial risk that the jury could impose a sentence based on, or appears to be based on, emotional consideration rather than instructed reason.

Aplt's App. at 187 (Dist. Ct.'s Mem. Op. and Order).

It also explained that the danger of unfair prejudice is too great in this case. *Id.* at 191 ("[T]his case is one in which even the best jury instructions would be insufficient to cure the unfair prejudice to Mr. Lujan if the jury were allowed to consider evidence of his alleged culpability for the Chamberino murders during the penalty phase of this trial."). Thus, there is more to the district court's opinion than the presumption of innocence

4

analysis identified by the majority. The district court aptly expressed a valid concern when it wrote "the Court foresees substantial risk that members of the jury may naturally confuse the issue and consider evidence of Mr. Lujan's alleged culpability for the Chamberino murders as an independent aggravating factor, tending to show that he merits death, rather than as evidence intended to establish the non-statutory aggravating factor of future dangerousness." *Id.* at 186.

The majority's opinion acknowledges the presence of this analysis—but finds that "concern about juror confusion . . . [is] overstated," maj. op. at 17, and that "there is nothing inherently 'unfair' with allowing the government some latitude to present the unfavorable aspects of the defendant, so long as that evidence is relevant to a properly identified aggravator and does not involve gratuitous gruesomeness or inflammatory detail beyond what is necessary to reveal to the jury the true nature of what happened." *Id.* at 14.

Although the majority's view is a reasonable one, it is important to note that any discussion about what impact admitting evidence before a jury might have is necessarily going to be a prediction and speculation. Every prosecution, and every jury, is different, and no one can be certain of the precise effect. It seems the majority opinion and the district court both draw plausible conclusions about the possible impact of the evidence. However, it also seems to me that the local district judge has a larger and better "feel of the case," as well as possessing a knowledge of the community that might inform his discretion.

In my view, the case law invoked by the majority does not establish that exclusion of the evidence "falls [outside] the realm of these rationally available choices." *McComb*, 519 F.3d at 1053. The majority's cases hold that various trial court decisions to *admit* allegedly prejudicial evidence did not constitute an abuse of discretion. *See* maj. op. at 16-17 (citing *United States v. McVeigh*, 153 F.3d 1166, 1216 (10th Cir. 1998); *Corley*, 519 F.3d at 726-27 (7th Cir. 2008); and *United States v. Sampson*, 486 F.3d 12, 43-44 (1st Cir. 2007)). But, of course, the mere fact that these cases conclude that the district court did not abuse its discretion in admitting evidence does not mean that discretion is abused when evidence is not admitted.

In addition, I do not share the concern that "reliable, informed decisionmaking" may be jeopardized by the district court's ruling here. Maj op. at 15. From the parties' submissions in this appeal it seems that, even without the evidence of the Chamberino murders, the government will be able to introduce ample evidence supporting its claim of Mr. Lujan's future dangerousness. The presence of that additional evidence, discussed clearly by the district court, also suggests that there was no abuse of discretion here.

Finally, one overriding concern I have with the majority opinion is the difficulty I foresee that district courts will have in the future exercising their discretion to exclude evidence. For example, if the assigned judge, who probably knows more about New Mexico juries than we do, concludes that the Chamberino evidence is so prejudicial that even the best curative instruction will not suffice, and that decision is overturned, I am not sure that evidence of unadjudicated conduct would ever be excluded. And this result would be clearly contrary to the statute.

6

### III.  CONCLUSION

In fairness, I cannot say whether, if I were the trial judge, I would have ruled the evidence admissible or inadmissible.  That would be a difficult decision.  But we are not faced with that decision de novo.  We are reviewing an experienced judge's decision for abuse of discretion in an area where the statute has expressly granted the court significant discretion, and in an area that has no easy answers.  Accordingly, I would defer to his judgment on this matter.  I appreciate the fine and thorough work of the panel, but I cannot join its conclusion.  When reasonable judges can reasonably disagree, I see no abuse of discretion.